1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10   JOSEPH SICILIA,                         CASE NO. C09-710-RSM

11                    Plaintiff,             ORDER GRANTING IN PART
                                             DEFENDANTS' MOTION FOR
12        v.                                 SUMMARY JUDGMENT

13   THE BOEING COMPANY, et al.,

14                    Defendants.

15

16                          **I. INTRODUCTION**

17        This matter comes before the Court upon Defendants' Motion for Summary Judgment or,

18   In the Alternative, for Partial Summary Judgment.  Dkt #129.  Plaintiff Sicilia brings causes of

19   action against the Defendants for (1) Unlawful Retaliation in Violation of the False Claims Act

20   ("FCA"), (2) Violation of the Illinois Whistleblower Act ("IWA"), (3) Violations of the

21   Washington Law Against Discrimination ("WLAD"), (4) Violations of the Washington State

22   Family Leave Act ("WFLA"), (5) Violations of the Federal Medical Leave Act ("FMLA"), and

23   (6) Retaliation and Wrongful Discharge in Violation of Public Policy.  Compl. pp. 35-41.

24

1  Defendants argue that each claim fails as a matter of law.  The Court GRANTS Defendants'

2  motion in part and DENIES Defendants' motion in part.

3  **II. DISCUSSION**

4  **A. Background**

5      On July 24, 2003, as a result of a pending criminal investigation into alleged ethics

6  violations and the indictment of two former Boeing employees, the United States Air Force

7  suspended Boeing from future government contracting.  Dkt. #115, Ex. 1 at p. 1.  In an effort to

8  restore its contracting rights, Boeing entered into a contract with the United States Air Force

9  (USAF), known as the Interim Administrative Agreement ("AA").  Under the AA, Boeing was

10  required to create the Office of Internal Governances ("OIG") to monitor compliance and

11  oversight and to hire a Special Compliance Officer ("SCO") to act as a consultant and monitor

12  Boeing's compliance with the AA.  *Id.*  The appointed SCO was a retired Air Force General

13  named George T. Babbit.  Dkt. #105 at ¶11.

14      In 2002, Plaintiff  began working as an "Ethics and Compliance Specialist" in Boeing's

15  Chicago office.   A substantial part of his job after 2003 was monitoring compliance with the

16  AA.  Dkt. #116, Ex. D at 10:8-12.  The AA incorporated a compliance risk management

17  ("CRM") process that was documented in an internal procedure called Boeing PRO 3175.  Dkt.

18  #115, Ex. 2.  Under PRO 3175, a Compliance Survey was to be used as a "diagnostic tool" to

19  assess the health of Boeing's compliance management controls and programs.  *Id.*  Sicilia was

20  largely responsible for administering the Compliance Survey.  Further, his job duties required

21  him to inform his managers of any perceived issues concerning compliance and the CRM

22  process, including whether he believed the company was out of compliance with laws,

23

24

1    regulations, company policies, or contractual obligations.  *See, e.g.,* Dkt. #107, Ex. A at 22:12-
2    25:3.

3          A year after Boeing signed the AA, Kathy Humenick was hired to run the compliance
4    oversight team.  Dkt. #116, Ex. A at 12:10-12, 13:7-9.  Humenick had previously worked in the
5    business units and did not have experience in compliance.  *Id.* at 6:19-8:9, 13:10-14.   Humenick
6    attempted to make several changes to the compliance oversight process.  She tried to move
7    compliance training from OIG to Human Resources ("HR"), to reduce the amount of questions
8    on the Compliance Survey, and to implement a reduced oversight process wherein certain
9    executives could opt out of the formal process by submitting brief compliance statements.  Dkt.
10   #116, Ex. D at 36:16-44:7.  Sicilia told Humenick that these changes would take Boeing out of
11   compliance with the AA and government contracting.  *Id.*  As a result, these changes did not take
12   place at that time.  After Sicilia prevented the changes from taking place, Humenick's attitude
13   towards Sicilia allegedly became negative.  *Id.* at 45:6-23; Dkt. #115, Ex. 5.  Humenick and a
14   Boeing VP allegedly told Ed Carr, Boeing's Director of Ethics and Business Conduct, that they
15   planned to get rid of Sicilia because he was "not a team player."  Dkt. #117 at ¶10.  Carr believed
16   that Humenick and the VP were upset with Sicilia because he was protesting the changes in the
17   compliance process.  *Id.*

18         In 2006, Humenick was replaced by Carrie Hill.  Carrie Hill also had no experience in
19   compliance or ethics.  Dkt. #116, Ex. B at 146:19-20.  Hill also tried to make changes to the
20   compliance process, including attempts to move compliance training out of the OIG, cancel a
21   required procedure, and eliminate the Compliance Survey.  Dkt. #116, Ex. D at 51:18-67:18.
22   Sicilia alleges that, on one occasion, Hill misrepresented who was part of the Compliance Risk
23   Management Board.  *Id.* at 85:17-86:3.  Sicilia's wife, Tina, who also worked at Boeing, alleges
24

1    that Hill pressured her to re-write a compliance report to the SCO.  Dkt. #116, Ex. E at 61:20-

2    63:9.  Later that same year, Hill selected and promoted Randy Hayes into a newly created

3    position within the compliance oversight team.  Dkt. #116, Ex. F at 9:10-11, 58:22-59:2.  Hayes

4    also had no experience in compliance or ethics.  *Id.* at 67:4-18.

5         Sicilia protested each of the "violations of policy" committed by Humenick and Hill.

6    Dkt. #113 at p.6; Dkt. #114 at ¶11.  Sicilia and reported to others that Boeing was certifying to

7    the government that it was in compliance with various laws and regulations and the AA, but that

8    it was not in compliance, and therefore Defendants were committing fraud.  Dkt. #116, Ex. D at

9    359:14-360:21.  Plaintiff spoke to several people within Boeing about his concerns surrounding

10    Hill and Humenick's changes to the compliance process, including Mark Reardon (legal), John

11    Griffin (finance), his wife (compliance), Charles Rutherford, Carol Atkins, and several members

12    of the Compliance Risk Management Board.  Sicilia alleges that most of his complaints were

13    verbal because he avoided putting his concerns in writing due to his fear of retaliation. *See, e.g.,*

14    Dkt. #116, Ex. D at 49:15-24; Dkt. #113 at p.7.  In the summer of 2006, Sicilia complained to

15    Millie Weaver in HR that he believed that Hill's changes to the compliance process might put

16    Boeing at risk and that he was being retaliated against for raising these compliance issues to Hill.

17    Dkt. #116, 146:16-147:13; Dkt. #115, Ex. 8.  Weaver recommended that Sicilia report to the

18    Ethics Office, which he did in the fall of 2006.

19         Sicilia participated in a "mediation" with Carrie Hill, Matt Frank (Ethics), and Diane

20    Kallunk (HR) in December 2006.  Sicilia told Hill that removing executive involvement,

21    expanding the reduced oversight program, and eliminating the Compliance Survey could be

22    considered fraudulent because it would put Boeing out of compliance with the AA.  Dkt. #116,

23    Ex. D at 352:4-353:6.  Sicilia thought that if Boeing was certifying that it was in compliance

24

ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 4

1    with the AA when it was not, it would be fraudulently bidding on contracts.  *Id.*  He told the

2    group that he would be forced to go to the government if Boeing was falsely reporting

3    compliance.

4            The day following the mediation, Sicilia received a poor performance review.  Dkt. #115,

5    Ex. 10.  However, the review had been prepared prior to the mediation taking place.  Dkt. #119,

6    Ex. B.  Sicilia's meeting with Hayes concerning the review had also been originally scheduled to

7    take place before the mediation.  Dkt. #119, Ex. A.  The meeting was postponed until after the

8    mediation at Sicilia's request.  *Id.*

9            Two weeks after the mediation, Sicilia went on FMLA medical leave.  During his leave,

10   Sicilia was temporarily denied medical benefits by his insurance company.  Sicilia told Matt

11   Frank that he felt he was compelled to go outside the company with compliance issues because

12   he felt his difficulty getting benefits during his leave was retaliation for his compliance

13   complaints.  Dkt. #116, Ex. D at 299:20-300:12.  During this time, Hill and Hayes were working

14   on revising the survey and Hayes was creating an abbreviated questionnaire.  Dkt. #116, Ex. F at

15   136:6-137:3.

16           When Sicilia returned from leave in March 2007, Sicilia was asked to stop working on

17   the Compliance Survey and to work instead on compliance issues with Boeing subsidiaries.  *Id.*

18   at 84:19-85:6.  Sicilia was moved to the Corporate Secretary's Office where he had little

19   interaction with OIG.  Dkt. #116, Ex. D at 159:17-160:14.  His office was moved off of the

20   executive floors and he was tasked with sitting in a "vault," performing largely administrative

21   work involving creating a list of subsidiaries.  *Id.*  Sicilia continued to lodge complaints about the

22   changes to the compliance process and threatened again to go outside the company, allegedly to

23   report what he perceived to be fraud.  Dkt. #115, Ex. 14.

24

ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 5

1  Sicilia's written complaints between 2004 and 2007 do not allege violations of the False

2  Claims Act or include allegations of fraud.  *Id.*  Matt Frank's notes reflect that Sicilia was

3  alleging retaliation for his filing of an EEO complaint against Humenick for failure to

4  accommodate under the Americans with Disabilities Act ("ADA").  Dkt. #115, Ex. 9.  In a July

5  2007 email to Matt Frank, Sicilia alleged retaliation and violation of the ADA.  Dkt. #115,

6  Ex. 14.  Sicilia states that he did not put his fraud-related allegations in writing because he feared

7  retaliation.  Dkt. #113 at p.7.

8  In September of 2007, Boeing engaged in an alleged Reduction in Force ("RIF") and

9  Sicilia received a 60-day lay-off notice. A factor in the decision to lay off Sicilia was that he was

10  in a "non-essential function."  Dkt. #116, Ex. E at 112:8-15.  Sicilia perceived the RIF notice as

11  retaliatory and complained to HR.  Dkt. #114 at ¶20.  On November 16, 2007, Sicilia was

12  terminated from Boeing.  Two others were also selected in the RIF, but were able to find other

13  positions at Boeing.  *Id.* at 98:1-99:22.

14  **B.  Standard of Review**

15  Summary judgment is appropriate where "the pleadings, the discovery and disclosure

16  materials on file, and any affidavits show that there is no genuine issue as to any material fact

17  and that the movant is entitled to judgment as a matter of law."  FRCP 56(c); *Anderson v. Liberty*

18  *Lobby, Inc*., 477 U.S. 242, 247 (1986).   In ruling on summary judgment, a court does not weigh

19  evidence to determine the truth of the matter, but "only determine[s] whether there is a genuine

20  issue for trial."  *Crane v. Conoco, Inc.*, 41 F.3d 547, 549 (9th Cir. 1994) (*citing O'Melveny &*

21  *Meyers*, 969 F.2d at 747).  Material facts are those which might affect the outcome of the suit

22  under governing law.  *Anderson,* 477 U.S. at 248.

23  The Court must draw all reasonable inferences in favor of the non-moving party.  *See*

24  *F.D.I.C. v. O'Melveny & Meyers*, 969 F.2d 744, 747 (9th Cir. 1992), *rev'd on other grounds*, 512

1    U.S. 79 (1994).  However, the nonmoving party must make a "sufficient showing on an essential

2    element of her case with respect to which she has the burden of proof" to survive summary

3    judgment.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  Further, "[t]he mere existence of

4    a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be

5    evidence on which the jury could reasonably find for the plaintiff."  *Id.*

6    **C.  FCA Retaliation**

7         Plaintiff Sicilia alleges that he suffered retaliation as a result of his complaints about

8    Humenick and Hill's dismantling of the CRM process and that such retaliation constitutes a

9    violation of the False Claims Act.  *See* 31 U.S.C. § 3730(h).  Congress enacted the False Claims

10   Act with the purpose of "[combating] widespread fraud by government contractors who were

11   submitting inflated invoices and shipping faulty goods to the government." *United States ex rel.*

12   *Hopper v. Anton,* 91 F.3d 1261, 1265-66 (9th Cir.1996).  Accordingly, the False Claims Act

13   creates liability for any person who, *inter alia,* "(A) knowingly presents, or causes to be

14   presented, a false or fraudulent claim for payment or approval [to the government]; (B)

15   knowingly makes, uses, or causes to be made or used, a false record or statement material to a

16   false or fraudulent claim."   31 U.S.C. 3729(a)(1).  Pursuant to the Act, a person may file a *qui*

17   *tam* action on behalf of the person and the federal government for any violation of section 3729.

18   31 U.S.C. § 3730( b).

19        The False Claims Act also protects "whistle blowers" from retaliation by their employers

20   for protected activities.  Accordingly, the Act provides relief for employees who are "discharged,

21   demoted, suspended, threatened, harassed, or in any other manner discriminated against in the

22   terms and conditions of employment because of lawful acts done by the employee . . . in

23   furtherance of an action under this section or other efforts to stop 1 or more violations of this

24   subchapter."  31 U.S.C. § 3730(h).

ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 7

1    In the instant action, Sicilia does not allege that the Defendants submitted false claims to

2    the government under the False Claims Act.  Rather, Sicilia alleges violations of the anti-

3    retaliation provisions found in §3730(h) of the Act.  A plaintiff alleging an FCA retaliation claim

4    need not show that the defendant actually submitted a false claim to the government, only that he

5    reasonably suspected as much.  *See Mendiondo v. Centinela Hosp. Med. Ctr.,* 521 F.3d 1097,

6    1104 (9th Cir. 2008). To succeed on a claim for retaliation under the FCA, an employee must

7    prove three elements: (1) that the employee engaged in activity protected under the statute; (2)

8    that the employer knew that the employee engaged in protected activity; and (3) that the

9    employer discriminated against the employee because she engaged in protected activity.  *Id.;*

10   *Moore v. California Inst. of Tech. Jet Propulsion Lab.,* 275 F.3d 838, 844 -845 (9th Cir. 2002).

11       1.  Sicilia was not engaging in conduct protected under the Act.

12       For purposes of the first element, Sicilia engaged in protected activity under the Act if he

13   reasonably believed that the Defendants were committing fraud against the government, and

14   Sicilia investigated that fraud.  *See Mendiondo,* 521 F.3d at 1104.  Whether Sicilia reasonably

15   believed that Boeing was committing fraud contains both an objective and subjective element:

16   (1) whether the employee in good faith believed that fraud was taking place and (2) whether "a

17   reasonable employee in the same or similar circumstances might believe, that the employer [was]

18   possibly committing fraud against the government." *Moore*, 275 F.3d at 845 -846.

19       *a.  Subjective Prong*

20       There are issues of material fact regarding whether Sicilia had a good faith belief that the

21   Defendants were perpetuating fraud on the government.  Defendants argue that Sicilia lodged

22   several complaints concerning interpersonal issues with supervisors, disability discrimination

23   and retaliation for complaints of disability discrimination, but that none of Sicilia's

24   contemporaneous writings claimed that Boeing was submitting false claims to the government.

1    Dkt. #129 at 4.  They also identify several admissions made by Plaintiff wherein he claims that

2    his goal in making complaints about the compliance process had been to let his supervisors

3    "know that … Boeing very well could be out of compliance with its compliance obligation …

4    and it needs to be looked into," and that he was simply "trying to keep [his supervisors] in check

5    and trying to maintain compliance."  *See, e.g.,* Dkt. #107, Ex. A at 102:5-17.  According to

6    Defendants, Sicilia's complaints about the proposed elimination of the risk assessment survey as

7    part of the CRM process "were merely statements of what he believed to be 'the best way' to

8    conduct risk assessment."  Dkt. #129 at 13.  Thus, Sicilia's "intra-corporate debates about best

9    practices," did not concern fraud and are not protected under the FCA.  *Id.*

10        Nonetheless, the Court is satisfied that plaintiff has raised an issue of material fact

11    regarding whether he believed Defendants were engaged in fraud.  Plaintiff submitted a

12    declaration and testified in his deposition that he believed Defendants were committing fraud.

13    *See* Dkt. #114 ¶11; Sicilia Dep., 359:17-360:3.  He claimed to have believed that Boeing was

14    required to certify that it was in compliance with "rules and regulations" (which included having

15    a compliance program) when it entered into contracts with the government and that being out of

16    compliance therefore constituted fraud.  *Id.*  He also stated that he believed that not following

17    through with the requirements of the AA constituted fraud.  *Id.* at 360:4-360:10.  Finally, Sicilia

18    presented evidence that he told his managers and HR that he would be forced to report to the

19    government if Boeing continued down a road of noncompliance.  Sicilia Dep., 214:10-21; Dkt.

20    #114 ¶ 11.  This supports an inference that Sicilia thought that Boeing was defrauding the

21    government and the government would want to know about it.  Construing all inferences in favor

22    of the plaintiff, there is a genuine issue of material fact regarding whether Sicilia had a good faith

23    belief that Boeing was defrauding the government.

24

1        b.   *Objective Prong.*

2        Even if Sicilia genuinely believed that Boeing was engaged in the type of fraud that

3   would be actionable under the FCA, his claim fails as a matter of law if he cannot show that his

4   belief was objectively reasonable.  *See Moore,* 275 F.3d at 845.   Sicilia fails to provide any

5   argument to the Court about how and if he has met his burden to show that his belief would have

6   been reasonable to an employee in the same or similar situation as the plaintiff, as required under

7   *Moore.*  Instead, Sicilia expends a substantial portion of his opposition brief expanding on the

8   proposition that a plaintiff need not prove a violation of § 3729 in order to bring a retaliation

9   claim under the FCA.  Dkt. #113 at 13-15.  While this is true, it does not follow that a plaintiff is

10  entitled to move forward on an FCA retaliation claim based on good faith belief alone.

11       As set out in Defendants' Motion, a core element of any FCA action is that there be an

12  actual or potential false claim made against the U.S. Government.  *See U.S. ex rel. Hopper v.*

13  *Anton,* 91 F.3d 1261, 1266-67 (9th Cir. 1996).  Plaintiff's claim rests on a "false certification"

14  theory – that Boeing "falsely certifie[d] compliance with a statute or regulation [or contract] as a

15  condition to government payment."  *U.S. ex rel. Hendow v. Univ. of Phoenix,* 461 F.3d 1166,

16  1171 (9th Cir. 2006).  *See also* Dkt. #114 ¶11; Sicilia Dep., 359:17-360:3.  However, Sicilia

17  failed to unearth any evidence that would support such a theory.  First, Sicilia has failed to

18  demonstrate any basis for his belief that a certification requirement existed.  Second, even if such

19  a certification requirement existed, his idea of what would constitute "fraud" with respect to an

20  allegedly false certification simply does not comport with the definition of fraud under the FCA.

21  For these reasons, Sicilia's belief that Boeing was perpetuating fraud against the government is

22  unreasonable.

23       Sicilia thought Boeing was required to certify that it was in compliance with all federal

24  laws and regulations when it entered into contracts with the government.  *See* Dkt. #114 ¶3

1   ("[E]ach time Boeing submits a bid, grant proposal, or other request for funds from the federal

2   government, it must certify that it is in compliance with federal contracting laws and

3   regulations."); Sicilia Dep., 360:15-21 ("[W]hen you enter into a contract with the government

4   you certify that you are complying with the rules and regulations, and that includes having a

5   compliance program."). Crucially, however, Sicilia has failed to identify a single contract

6   between Boeing and the government that contains such a statement. Sicilia's belief about the

7   certification requirement might be objectively reasonable, notwithstanding the absence of any

8   proof of any contracts containing such certification, if there were a policy or regulation that

9   required Boeing to certify it was in compliance with federal laws and regulations or that it had a

10   compliance program as a matter of course. Plaintiff, however, identifies no such policy or

11   regulation.

12         Plaintiff's Opposition provides the Court with no guidance concerning what regulation

13   might require Boeing to certify that it was in compliance with regulations and laws concerning

14   compliance programs. Further, the regulations that are discussed in the record do not pertain to

15   certification requirements that would implicate Boeing's compliance process. For example, 48

16   C.F.R. § 52.209-5 describes a certification that is required by 48 C.F.R. § 9.104-5 under the

17   Federal Acquisition Regulations. Section 9.104-5 requires the *government official* presiding

18   over a given contract bid to make a determination of a contractor's responsibility, including

19   whether the prospective contractor has a "satisfactory record of integrity and business ethics."

20   *See Precision Standard, Inc. v. United States,* 69 Fed. Cl. 738, 752 (2006). Section 52.209-5, in

21   turn, requires an offeror to certify that it is not "presently debarred, suspended, proposed for

22   debarment, or declared ineligible for the award of contracts by any Federal agency" and that it

23   has not been criminally convicted or had a civil judgment rendered against it for a variety of

24

ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 11

1    offenses.  48 C.F.R. § 52.209-5 (2010).  Neither regulation requires that Boeing certify general

2    compliance with federal laws or that it have a compliance program.

3            In deposition, Sicilia stated that he believed that there was an additional requirement "in

4    both the FARs and DFARs," but has not come forth with any evidence to substantiate that belief.

5    Plaintiff's complaint identifies Part 9-10401(d) of the Federal Acquisition Regulations ("FAR").

6    However, this provision merely provides that to be determined responsible, a contractor must,

7    "[h]ave a satisfactory record of integrity and business ethics."  48 C.F.R. 9-104-1 (2010).   It

8    does not involve certification.  Plaintiff states in his complaint that the AA required certain

9    processes for Boeing to remain eligible for government contracts.  Pls. Compl. ¶3.48.  However,

10   even if Boeing breached the AA, doing so would not constitute a false claim to the U.S.

11   government absent some evidence that Boeing certified to the government that it was in

12   compliance with the AA.  *See Hendow,* 461 F.3d at 1172.  Plaintiff has produced no evidence of

13   any such requirement.  Finally, Plaintiff has not provided any evidence that Boeing certified it

14   was in compliance with the U.S. Sentencing Guidelines Ch. 8b2.1.  *See* Compl. ¶3.79.

15           As a "specialist" in ethics and compliance, Sicilia had heightened visibility into the kinds

16   of certification processes that he alleges are at issue in this lawsuit.  Yet, he has not produced

17   evidence of a single, specific certification statement that was made by Boeing to the U.S.

18   government in any capacity.  Nor has he identified any regulation that requires that such

19   certification statements be made as a matter of course by a contracting entity.  Thus, Sicilia has

20   failed to provide evidence to substantiate his belief that Boeing was submitting false certification

21   statements to the government.

22           Even if Boeing was certifying compliance to the government, Sicilia's belief that making

23   changes to the CRM process would render statements fraudulent simply does not comport with

24

ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 12

1   the law respecting what constitutes fraud under the FCA.  To bring a claim under the FCA based

2   on a false certification theory, a plaintiff must prove four elements: (1); that there be a *false*

3   claim rather than a "mere unintentional violation," (2) that there scienter, or a "palpably false

4   statement, known to be a lie when it is made," (3) that the false statement must be material to the

5   government's decision to pay out money to the claimant, and (4) that there be an actual claim,

6   "which is to say, a call on the government fisc."  *Hendow,* 461 F.3d at 1172-73.  Plaintiff has

7   not produced substantial evidence to support *any* of the *Hendow* elements.

8          The record evinces disagreements between Sicilia and his superiors about aspects of the

9   CRM process that were necessary to remain in compliance with the AA and other applicable

10  laws concerning compliance programs.  For example, Sicilia testified that he told Hill that if she

11  wanted to expand the reduced oversight program, "there still needed to be some level of

12  assessing going on," and that "the best way to do that was to … ask it in some sort of survey

13  form."  Dkt. #107, Ex. A at 66:2-14.  It does not, however, reveal that implementing any of the

14  contemplated changes to the CRM were understood to be clear violations of any rule or law or

15  the Administrative Agreement such that certifying compliance would be patently false.[1]   Nor

16  does the record demonstrate that any Boeing officer possessed the requisite intent to lie on

17  alleged certification statements.  Sicilia alleges that his superiors were underqualified for their

18  positions and had no knowledge or experience in compliance, not that they knew what they were

19  doing and intentionally lied to get government contracts.  *See* Dkt. #113 at 5.  *Cf. Moore,* 275

20  F.3d at 846 (determining that there was a genuine issue of material fact regarding whether

21

22  _____

    [1] The AA required, *inter alia,* that Boeing "continue to use its Compliance Assessment Process
23  to evaluate the efficacy of the procedures and training programs" and that the Compliance
    Assessment Team establish and execute "robust compliance process and procedures consistent
24  with the Compliance Assessment Process."  *See* Dkt#105, Ex. D, Art. 3.

ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 13

1   plaintiff engaged in protected activity because a reasonable jury could conclude that plaintiff's

2   employer had lied to the outside expert in order to increase the amount of compensation it would

3   receive from NASA).

4        Finally, because Sicilia fails to identify any certification requirement, he also cannot

5   show that Boeing's receipt of moneys from the government was contingent on such a

6   certification.  Indeed, the evidence supports the opposite conclusion: that Boeing's contracts

7   were not contingent on the completion of Compliance Surveys or to-the-letter compliance with

8   PRO-3175.  Boeing disclosed to the Air Force through reports to and by the SCO in December

9   2006, February 2007 and March 2007 that it was making changes to the CRM process.  *See* Dkt.

10  #105, Ex. F at 11, 71-73, Ex. G at 2, Ex. H at 6; Dkt #107, Ex. E at 96-9-98:8, 118:23-120:24.  In

11  December 2007, the SCO Final Compliance Report noted that "[d]ue to this reorganization of the

12  CRM process, the surveys did not occur in 2007."  Dkt. #105, Ex. F at 72.  In a February 2008

13  letter from the SCO to the Air Force, the SCO reported that "Management's goal is to make the

14  process more effective and efficient than the previous survey based process… Boeing's planned

15  CRM Program meets the intent of the Agreement."  Dkt. #105, Ex. G at 3.  If changes to the

16  CRM process were material to the government's decision to continue to provide contracts to

17  Boeing, one would expect that outright disclosure of the action would affect Boeing's good

18  status with the government.  There is no evidence, however, that the disclosure had any such

19  effect.

20       To be clear, Plaintiff need not prove each of the *Hendow* elements in order to succeed on

21  a claim for retaliation under the FCA.  *See Mendiondo,* 521 F.3d at 1103 (citing *Graham County*

22  *Soil & Water Conservation Dist. V. Unites States ex rel. Wilson,* 545 U.S. 409, 416-17 (2005)

23  ("[T]o state a FCA retaliation claim, a plaintiff must show that he or she suspected that the

24

ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 14

1  defendant submitted a false claim – not that the defendant actually submitted one.").

2  Nonetheless, the degree to which plaintiff's suspicion of fraud corresponds with what the

3  defendants were actually doing is relevant to whether plaintiff's suspicion of fraud was

4  reasonable.  *See Moore,* 275 F.3d at 845 (holding that a plaintiff bringing an FCA retaliation

5  claim must show actual or potential actions by the employer that "reasonably could lead to a

6  *viable* FCA action")(emphasis added).  Otherwise, any employee who concocted a theory about

7  how his employer was defrauding the government could avail himself of the protections of the

8  FCA – regardless of how far-fetched his theory might be. The fact that Sicilia's evidence does

9  not support his false certification theory under *Hendow* merely illustrates the fact that Sicilia's

10  suspicions of fraud, even if they were genuine, do not go to the kind of fraud contemplated and

11  protected under the FCA.

12        Rather, Sicilia's claim is similar to the claim at issue in *Hopper,* wherein special

13  education teacher Sheila Hopper complained that her school district was not in compliance with

14  state and federal regulations concerning the handling of special education children.  *Id.* at 1263-

15  64.  Hopper argued that the school district was engaged in fraud under the FCA because it

16  submitted annual certificates to the California Department of Education certifying that the

17  district would meet "all applicable requirements of state and federal law and regulations," as a

18  condition for receiving federal funding.  However, the school district was not in compliance with

19  certain provisions of the IDEA so the certification statements were in fact false.  *Id.*   Shortly

20  after making these complaints, Hopper was investigated for use of inappropriate corporal

21  punishment in the classroom and allowing a student to arrive late to school without proper

22

23

24

1   authority, for which the district decided to suspend Hopper for fifteen days.[2]  *Id.*  Hopper brought

2   claims in federal district court under the *qui tam* and anti-retaliation provisions of the FCA. *Id.*

3         The Ninth Circuit held that there was insubstantial evidence to support the finding that

4   Hopper was engaged in activity protected under the Act.  *Id.* at 1269.  In so holding, the Ninth

5   Circuit found that "the record quite clearly shows Hopper was merely attempting to get the

6   School District to comply with Federal and State regulations" and that her "numerous written

7   complaints, seventy letters and over fifty telephone calls were all directed toward this end."  *Id.*

8   Finding that "she was not trying to recover money for the government," "she was not

9   investigating fraud," and "[s]he was not whistleblowing as envisioned in the paradigm *qui tam*

10  FCA action," the court determined that the district court should have granted the defendant's

11  motion for judgment as a matter of law.  *Id.*

12        Like Hopper, Sicilia is proceeding on a theory of false certification.  *See* Dkt. #113 p. 3;

13  Sicilia Dep., 352:25-353:6. Like in *Hopper*, rather than attempting to recover money for the

14  government, "as envisioned in the paradigm *qui tam* FCA action," Sicilia's investigatory efforts

15  were centered on trying to get Boeing to comply with the AA, federal regulations, and Boeing's

16  internal policy.  *See Hopper,* 91 F.3d at 1269 ("Hopper was merely attempting to get the School

17  District to comply with Federal and State regulations.").   Like in *Hopper,* "[t]he entire record

18  fails to demonstrate [Sicilia] was engaged in 'furtherance of an action' under the FCA."  *Id.*

19  Even if Sicilia had a good faith belief that Defendants' elimination of the Compliance Survey

20  constituted fraud, *Hopper* stands for the proposition that such a belief is not objectively

21  reasonable where there is no "nexus to the FCA."  *Id.*   In the case at bar, Sicilia has failed to

22

23  _____

24  [2] Hopper never served the suspension because an arbitrator found that the district had failed to
    prove the charges

ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 16

1   demonstrate any false claim, any false certification, any intentional lie, and any government

2   contract contingent on certification.  In short, he has demonstrated no nexus to the FCA.  As a

3   result, the evidence supports but one conclusion: his belief that Boeing was defrauding the

4   government is objectively unreasonable.

5       2.   Boeing did not know Sicilia was engaged in protected conduct.

6       Even if Sicilia had raised an issue of material fact regarding whether he was engaged in

7   protected activity, he cannot show that Boeing knew that was the case when he experienced the

8   alleged retaliation.  Sicilia must prove that Boeing knew that he was engaged in protected

9   activity in order to succeed on his FCA retaliation claim.  Unless an employer is aware that its

10  employee is investigating fraud, the employer cannot "possess the retaliatory intent necessary to

11  establish a violation of § 3730(h)."  *Hopper,* 91 F.3d at 1269 (citing *Robertson v. Bell Helicopter*

12  *Textron,* 32 F.3d 948, 950-52 (5th Cir. 1994).

13      Defendants argue that, because Sicilia served as an "Ethics and Compliance Specialist"

14  for Boeing, there is a presumption that any complaints he made about Boeing's non-compliance

15  were made within the scope of his job duties.  Dkt. #119 pp. 6-7.  Therefore, Sicilia is subject to

16  a higher standard and must show clear notice to the employer of his "intentions of bringing or

17  assisting in an FCA action."  *Id.* at 6.  The Court agrees with the Defendants.

18      While the Ninth Circuit has yet to explicitly consider the issue, other courts have held

19  that employees whose complaints fall within the scope of their job duties must provide their

20  employers with clear notice of their intent to pursue an FCA action in order to satisfy the second

21  element of a retaliation action under the statute.  *See, e.g., Yuhasz v. Brush Wellman, Inc.,* 341

22  F.3d 559, 568 (6th Cir. 2003) ("[E]mployees charged with investigating potential fraud are not

23  automatically precluded from bringing a Section 3730(h) action.  In light of their ordinary

24  responsibilities, however, such persons must make clear their intentions of bringing or assisting

1   in an FCA action in order to overcome the presumption that they are merely acting in accordance

2   with their employment obligations.") (internal citations omitted).  *See also, Robertson v. Beel*

3   *Helicopter Textron, Inc.,* 32 F.3d 948, 952 (5th Cir. 1994); *United States ex. rel. Ramseyer v.*

4   *Century Healthcare Corp.,* 90 F.3d 1514, 1522 (10th Cir. 1996).   This is because the statute

5   requires that the employer know that the employee was engaged in protected activity.  *See*

6   *Hopper,* 91 F.3d at 1269 (citing S.Rep. No. 345, 99th Cong., 2d Sess. 35 (1986), *reprinted in*

7   1986 U.S.C.C.A.N. 5266, 5300).   The employer cannot be assumed to have the requisite

8   knowledge when its employee is merely performing investigations incident to their job

9   description.

10         Plaintiff argues that telling his superiors that he intended to report to the government is

11   enough to make Boeing aware that he was engaged in protected activity.  *See* Dkt. #113 at 16.

12   The Court disagrees.  In *Hopper,* the plaintiff actually did report her concerns to the government.

13   91 F.3d at 1264.   Nonetheless, the *Hopper* court held that reporting to the government was

14   insufficient to show that the employer knew that the plaintiff was engaged in protected activity

15   because the plaintiff did not give the employer any indication that she was reporting in

16   connection with an FCA action.  *Id.*  Here, as in *Hopper,* Sicilia gave his company no reason to

17   believe he was contemplating or investigating a *qui tam* action.  Instead, Boeing had every

18   reason to believe that he was performing his job duties as a compliance specialist.

19         The Court also disagrees with Sicilia that a jury must decide the question of what

20   Plaintiff's job duties entailed.  Sicilia admits that it was his job "to report those instances that I

21   felt were endangering the company of falling out of compliance or were violating … whatever

22   law or regulation we were working with."  Dkt. #107, Ex. A at 33:6-19.  Sicilia admits that he

23   was an "Ethics and Compliance Specialist" for Boeing.  Dkt. #113 at 3.  Therefore, Sicilia's

24

1  complaints to his supervisors about Boeing's potential noncompliance would not have put

2  Boeing or Sicilia's supervisors on notice that Sicilia was investigating fraudulent activity.

3        Because Plaintiff has not produced substantial evidence to raise an issue of material fact

4  regarding whether he was engaged in protected activity or whether Boeing knew he was engaged

5  in protected activity, the Court need not address the remaining element of Plaintiff's FCA claim.

6  Plaintiff's claim fails as a matter of law.  Defendants' Motion for Summary Judgment is

7  GRANTED with respect to Plaintiff's FCA claim.

8  **D. Illinois Whistleblower Act**

9        Pursuant to the Illinois Whistleblower Act ("IWA"), "[a]n employer may not retaliate

10  against an employee for disclosing information to a government or law enforcement agency,

11  where the employee has reasonable cause to believe that the information discloses a violation of

12  a State or federal law, rule, or regulation." 740 ILCS 174/15.  Defendants move for summary

13  judgment on Plaintiff's IWA on the basis that Plaintiff  has not alleged or presented any evidence

14  to suggest that Plaintiff disclosed any information to a government official.  Dkt. #129 at 24.

15        The plain language of the statute requires that a plaintiff asserting a claim for violation of

16  the IWA show that he or she disclosed information to the government. *See* 740 ILCS 174/15

17  (prohibiting employer from retaliating against employee who disclosed information to "a

18  government or law enforcement agency").  Illinois courts have interpreted the statute

19  accordingly.  *See Riedlinger v. Hudson Respiratory Care, Inc.,* 478 F.Supp.2d 1051, 1055-56

20  (N.D. Ill. 2007) ("an employee has a cause of action for retaliatory discharge in Illinois only if he

21  or she has revealed information he or she reasonably believes discloses a violation of a law or

22  regulation *to some government or law enforcement agency*") (emphasis added); *Stiles v. Intl'l*

23  *BioResources, LLC,* No. 09-cv-4000, 2010 WL 2740312 (N.D. Ill. July 12, 2010) (assuming that

24

1  the IWA only applies to disclosures to government officials in holding that the IWA does not

2  abrogate common law whistleblower tort actions involving non-governmental officials).

3       Plaintiff asserts in his declaration that he spoke with Julie Meyer, "a member of the

4  Special Compliance Officer's team, which Boeing was required to employ pursuant to the AA"

5  and that he "assumed that [his] report to her would go directly to General Babbitt." Dkt. #114 at

6  ¶ 18.  Julie Meyer is a consultant that Boeing was required to hire to monitor compliance with

7  the AA.  Dkt. #113 at 2.  A consultant is not a "government or law enforcement agency."

8  Plaintiff therefore fails to allege or provide evidence as to an essential element of the IWA.

9       Even if the consultant with whom Sicilia spoke were deemed a government official for

10  the purposes of the IWA, Sicilia's claim fails because he does not provide any proof that Boeing

11  may have known about his conversations with the consultant.  "The mere existence of a scintilla

12  of evidence in support of the plaintiff's position" is insufficient to survive summary judgment.

13  *Celotex,* 477 U.S. at 323.  Sicilia has provided less than a scintilla.  Accordingly, Plaintiff's IWA

14  fails on the second ground that a jury could not find that Boeing knew about Sicilia's

15  conversations with the government consultant.  The Court GRANTS summary judgment to

16  defendants on Plaintiff's IWA claim.

17  **E.  Disability Discrimination**

18       Defendants move for summary judgment on Plaintiff's claim under the Washington Law

19  Against Discrimination ("WLAD").  Plaintiff does not oppose Defendants' motion for summary

20  judgment.  The Court considers Plaintiff's failure to oppose the motion as an admission that the

21  motion has merit.  *See* Local Rule CR 7(b)(2).  *See also Jenkins v. County of Riverside,* 398 F.3d

22  1093, 1095 n.4 (9th Cir. 2005); *Armstrong v. County of Kitsap,* No. C04-5461 2006 WL

23  3192518, *5-7 (W.D. Wash. Nov. 2, 2006).  Accordingly, Defendants' Motion for Summary

24  Judgment is GRANTED with respect to Plaintiff's claim under the WLAD.

## F.  Medical Leave Act Claims

Defendants move for summary judgment on Plaintiff's claims under the Federal Medical Leave Act ("FMLA") and the Washington State Family Leave Act ("WFLA").  First, Defendants assert that Plaintiff was restored to an equivalent position when he returned from leave.  Second, Defendants argue that Plaintiff was not entitled to the same position that he had before he took leave because that job was being phased out before and during his leave.  Finally, Defendants contend that Sicilia cannot establish that his termination was the result of his taking leave because of the significant time lapse between the two events.  Dkt. #129 at 29-30.  Sicilia argues that he was not returned to an equivalent position – that his new position in the Corporate Secretary's office was a demotion.  Further, he should have been returned to his original job because it had not yet been eliminated upon his return from leave.  Plaintiff does not address the lapse in time between his return from leave and his termination.  Instead, he argues that he was "moved to the 'non-essential' position so that he could be eliminate[d] under the guise of a RIF after promising to report the fraud to the government."  Dkt. #113 at 22.

Under the FMLA and the WSFLA, an eligible employee who takes leave is entitled to be restored to "an equivalent position with equivalent employment benefits, pay and other terms and conditions of employment."  29 U.S.C. §2614(a)(1)(B); Wash. Rev. Code §49.78.280; *Xin Liu v. Amway Corporation,* 347 F.3d 1125, 1132 (9th Cir. 2003).  "The FMLA does not entitle the employee to any rights, benefits, or positions they would not have been entitled to had they not taken leave."  *Liu,* 347 F.3d at 1132 (citing 29 U.S.C. § 2614(a)(3)(B)).  *See also* Wash. Rev. Code § 49.78.280(c)(ii).

It is undisputed that when Plaintiff returned to work in April 2007, he continued in the same job code and received the same level of benefits that he did before his leave began in January 2007.  Dkt. #107, Ex. C at 368:10-14.  Plaintiff earned slightly more pay in 2007 than he

1    did in 2006.  Dkt. #105, Ex. A.  However, the substance of Sicilia's work changed.  Sicilia was

2    asked to cease his work with the Compliance Survey and to focus instead on subsidiary

3    compliance issues.  Dkt #116, Ex. D at 159:17-21, 160:11-14.  He was moved to the Corporate

4    Secretary's Office.  *Id.*  His office was moved off of the executive floors and he alleges that he

5    was "literally put in a vault" where he was "stuck reading board resolutions and simply doing

6    administrative type work or clerical type work."  *Id.* at 159:19-22.  Plaintiff produces evidence

7    that the new job was a demotion.  Dkt. #117 at ¶12.

8         Sicilia has raised an issue of material fact regarding whether he was returned to an

9    equivalent position upon his return from medical leave.  Nonetheless, Defendants argue that

10   Sicilia's job was eliminated during his absence for reasons unrelated to his taking medical leave.

11   Dkt. #129 at p. 29.  They produce evidence that, during Sicilia's absence, the CRM process was

12   undergoing significant changes, including the revision and ultimate elimination of the

13   Compliance Survey that Sicilia was responsible for.  As a result, Plaintiff's work on the

14   Compliance Survey was no longer required.  Dkt. #129 at 29.  "Plaintiff's job duties would have

15   changed whether or not he took leave," Defendants argue, and Sicilia was not entitled to any

16   benefit or position that he would not have been entitled to had he not taken leave. Dkt. #130 at

17   16.

18        Plaintiff counters that Hayes continued to work on the Survey throughout 2007 until it

19   was finally eliminated in the fall of that year.  Dkt. #113.   Thus, Plaintiff raises a genuine issue

20   of material fact concerning whether Sicilia's job duties would have changed whether or not he

21   took leave.  Defendant's Motion for Summary Judgment with respect to Plaintiff's FMLA claim

22   is DENIED.

23

24

## G. Wrongful Discharge in Violation of Public Policy

To satisfy the elements of a claim of wrongful discharge in violation of public policy, the "plaintiff must prove (1) the existence of a clear public policy (clarity element); (2) that discouraging the conduct in which [he or she] engaged would jeopardize the public policy (jeopardy element); and (3) that the public-policy-linked conducted caused the dismissal (causation element)." *Hubbard v. Spokane County*, 146 Wash.2d 699, 707 (2002). Then, (4) "the defendant must not be able to offer an overriding justification for the dismissal (absence of justification element)." *Id.* Here, Plaintiff's claim fails because he has not satisfied the jeopardy element.

In order to satisfy the jeopardy element, a plaintiff must "show that other means of promoting the public policy are inadequate." *Korslund,* 156 Wash.2d 168, 182 (2005) (citing *Hubbard,* 146 Wash.2d at 716-17). Whether there are adequate alternatives is a question of law. *Id.* Here, as in *Korslund,* because the public policy at issue – the FCA, in this case – "provides comprehensive remedies that serve to protect the specific public policy," Plaintiff's wrongful discharge claim fails as a matter of law. *See also U.S.ex rel Zemplenyi v. Group Health Co-op.*, C09-0603-RSM,  2010 WL 3584444, *3 (W.D. Wash. Sept. 10, 2010) ("The prevailing policy of Washington courts has been to deny common law wrongful discharge claims when they are entirely duplicative of existing statutory remedies.") (citing *Hochberg v. Lincare, Inc.,* No. CV-07-0031, 2008 WL 1913853 at *4 (E.D.Wash. April 28, 2008)).  Defendants' Motion for Summary Judgment is GRANTED with respect to Plaintiff's wrongful discharge claim.

### III. CONCLUSION

Having reviewed the relevant pleadings, the declarations and exhibits attached thereto, and the remainder of the record, the Court hereby finds and ORDERS:

1   (1)   Defendants' Motion for Summary Judgment (Dkt. #129) is GRANTED in part and

2         DENIED in part.  All of Plaintiff's claims are dismissed except for Plaintiff's

3         claim for violation of the FMLA and the WFLA.

4   (2)   The Clerk is directed to forward a copy of this Order to all counsel of record.

5

6

7

    Dated January 25, 2011.

8

9

10

11

12   RICARDO S. MARTINEZ
     UNITED STATES DISTRICT JUDGE
13

14

15

16

17

18

19

20

21

22

23

24